
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT,** et al., <br><br> **Plaintiffs,** <br><br> v. <br><br> **MIKE POOL, et al.,** <br><br> **Defendants.** | Civil Action No. 12-1113 (JDB) |

## MEMORANDUM OPINION

This case concerns the Bureau of Land Management's ("BLM") obligation to protect land allotments under the Federal Lands Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1701 et seq. Plaintiffs, a conservation group and two of its individual members, filed a complaint alleging that BLM unlawfully withheld and unreasonably delayed implementation of the actions specified in its 2006 Rangeland Health Determinations for Utah public lands. Federal defendants have moved to transfer this case to United States District Court for the District of Utah. For the reasons detailed below, the Court will grant defendants' motion to transfer.

## BACKGROUND

FLPMA requires BLM to manage livestock grazing on public lands consistent with the "principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). It states that the Secretary of the Interior "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." Id. § 1732(b). BLM, under the direction of the Department of the Interior ("DOI") and in accordance with FLPMA, has promulgated regulations that establish fundamental ecological criteria for livestock grazing management on

BLM lands.  See 43 C.F.R. § 4180.1.  The regulations require BLM State Directors to develop state guidelines and standards ("Rangeland Health Standards") for grazing management in accordance with these fundamental ecological criteria and in consultation with the public, which are then approved by the Secretary of the Interior.  Id. § 4180.2(a)-(b).

BLM state offices also must periodically assess and evaluate grazing lands relative to the Rangeland Health Standards.  At the conclusion of these evaluations, BLM field offices produce Rangeland Health Determinations ("Determinations"), which detail whether grazing allotments conform with the agency's standards and whether "existing grazing management practices or levels of grazing use on public lands [] either are or are not significant factors" when an allotment fails to conform with the standards.  Bureau of Land Mgmt., H-4180-1, Rangeland Health Standards Manual I-2 (2001).  When a BLM Determination finds that standards are not being met in a particular area, BLM must "formulate, propose, and analyze appropriate action" that will result in significant progress toward attainment of the standards, then issue a final decision and/or documented agreement on the appropriate action.  See 43 C.F.R. § 4180.2(c).  The regulations then direct "an authorized officer" to "implement the appropriate action as soon as practicable, but not later than the start of the next grazing year."  Id.

On July 18, 2006, BLM released Determinations for eighty-four allotments in the Grand Staircase Escalante National Monument ("Grand Staircase") and adjoining Glen Canyon National Recreational Area ("Glen Canyon").  The Determinations identified twenty-one allotments that did not achieve one or more Rangeland Health Standards.  The Determinations specified appropriate actions for BLM to take to lead toward attainment of its Utah state standards and guidelines.  See Compl. ¶¶ 23-24 [ECF 1].

Plaintiffs, Western Watershed Project ("WWP") and two of its individual members, filed a Complaint on July 6, 2012, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §

706(1). The Complaint alleges that BLM failed to comply with its own regulations by not implementing the "appropriate actions" specified in the agency's 2006 Determinations for Grand Staircase and Glen Canyon, and that in so doing it unlawfully withheld and unreasonably delayed agency action.[1] Compl. ¶ 1. WWP is a non-profit conservation group headquartered in Idaho which focuses on public lands management and the impacts of livestock grazing in eight western states, including Utah. Compl. ¶ 3. Plaintiffs John Carter and Jonathan Ratner are WWP members who reside in Idaho and who actively derive enjoyment from the lands affected in this action. Compl. ¶¶ 6-9.

Defendants, Mike Pool, Acting Director of BLM, Jonathan Jarvis, Director of the National Park Service ("NPS"), and Kenneth Salazar, Secretary of the Interior, all reside in Washington, D.C. BLM is the federal agency that manages Grand Staircase and the grazing allotments within Glen Canyon. NPS is the federal agency that manages Glen Canyon, where portions of the allotments at issue are located. BLM and NPS are federal agencies within DOI, and thus DOI has ultimate responsibility for them. Federal defendants filed a motion to transfer venue to the United States District Court for the District of Utah on November 14, 2012 pursuant to 28 U.S.C. §§ 1404(a) and 1406(a). See Federal Defs.' Mem. in Supp. of the Mot. to Transfer [ECF 16-1] ("Defs.' Mot.").

---

[1] On September 19, 2011, plaintiffs made a comprehensive request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking "[a]ny and all records documenting the implementation of [the] 'appropriate actions'" specified in the 2006 Determinations for Grand Staircase and Glen Canyon. Compl. ¶ 26. BLM responded to the FOIA request by producing documents on November 3 and 17, 2011. Plaintiffs additionally sent a letter to BLM's Grand Staircase Office "requesting the status of certain actions taken on the 21 allotments in Grand Staircase and Glen Canyon." Compl. ¶ 28. BLM replied in a letter dated November 10, 2011, asserting that it was in compliance with its obligations and referring plaintiffs to the agency's FOIA response. Plaintiffs argue that "neither the letter nor the FOIA response demonstrated that BLM implemented the appropriate actions identified in the Determinations for the allotments it manages." Id.

## STANDARD OF REVIEW

District courts have discretion to transfer a case to another venue "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). Courts assess motions to transfer venue according to an "individualized, case-by-case consideration of convenience and fairness." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)). However, "a court may not transfer a case from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff." Sierra Club v. Van Antwerp, 523 F. Supp. 2d. 5, 11 (D.D.C. 2007) (internal quotation marks omitted). The moving party bears the initial burden of establishing that transfer is proper. S. Utah Wilderness Alliance v. Lewis, 845 F. Supp. 2d 231, 234 (D.D.C. 2012) ("SUWA III").

As an initial matter, defendants must establish that plaintiffs could have brought their suit in the transferee forum. 28 U.S.C. § 1404(a); see Thayer/Patricof Educ. Funding v. Pryor Resources, Inc., 196 F. Supp. 2d 21, 32 (D.D.C. 2002). When federal jurisdiction is not premised solely on diversity and a defendant is an officer, employee, or agency of the United States, venue is proper in any judicial district in which "(A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e). Here, federal question jurisdiction exists because the issue at controversy arises under federal law. Hence, venue would be proper in the District of Utah because the events or omissions giving rise to the claim occurred in Utah. In particular, the dispute concerns actions or inactions taken by the BLM's Utah State Office in relation to the 2006 Determinations concerning land in Utah. The parties do not dispute that

plaintiffs could have brought this suit in the District of Utah.  See Pls.' Opp'n to Federal Defs.' Mot. to Transfer at 10 [ECF 17] ("Pls.' Opp'n); Defs.' Mot. at 5-6.

Next, defendants must demonstrate that both private convenience factors for the parties involved as well as "public-interest factors of systemic integrity and fairness" that fall "under the heading of 'the interest of justice'" weigh in favor of transfer.  Stewart Org., 487 U.S. at 30.  The private interest factors are "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof."  Sierra Club v. Flowers, 276 F. Supp. 2d 62, 65 (D.D.C. 2003).  The public interest factors are "(1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the transferor and transferee courts; and (3) the local interest in deciding local controversies at home."  Id.

## DISCUSSION

Defendants contend that this case should be transferred to the District of Utah pursuant 28 U.S.C. § 1404(a) because the District of Columbia only has an attenuated connection to plaintiffs' claims, which have a "clear connection" to Utah.  In particular, defendants allege that the relevant actions at issue were administered in and impact conditions in Utah, not the District of Columbia.  See Defs.' Mot. at 1-2, 6, 8; Def.'s Reply at 8.  Furthermore, defendants argue that the District of Utah is a more convenient forum for all parties.  See id. at 1-2, 10.  Plaintiffs respond that venue is proper here and that defendants' motion does not overcome the "strong presumption in favor of the plaintiff[s'] choice of forum," Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981), especially since the case concerns unique national resources, "involves judicial review of agency action that is preserved in the administrative record, and [] likely will be resolved on summary judgment on the basis of that administrative record," Otay Mesa Property,

5

Inc. v. DOI, 584 F. Supp. 2d 122, 125 (D.D.C. 2008).  See Pls.' Opp'n at 2.

The court concludes that, on balance, the private and public interest factors weigh in favor of transfer.  In particular, deference to plaintiffs' choice of forum is diminished because the District of Columbia has no meaningful ties to the controversy, and "perhaps [the] most important factor – the interest in having local controversies decided at home," Pres. Soc. of Charleston v. U.S. Army Corps of Eng'rs, 893 F. Supp. 2d 49, 54 (D.D.C. 2012), tips strongly in favor of transfer.  The Court thus concludes that defendants have met their burden of showing that transfer to the District of Utah is appropriate.

I.      Private Interest Considerations

   a.  Choice of Forum and Where the Claim Arose

"Courts ordinarily accord significant deference to a plaintiff's choice of forum."  Van Antwerp, 523 F. Supp. 2d at 11.  That deference, however, is lessened "if a plaintiff's choice of forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter."  Flowers, 276 F. Supp. 2d at 67 (internal quotation marks omitted).  Thus, the degree of deference accorded to plaintiffs' choice of forum "depends on the existence of a connection between the underlying case and this district."  Nat'l Ass'n of Home Builders v. EPA, 675 F. Supp. 2d 173, 180 (D.D.C. 2009) (internal citations omitted).

Plaintiffs specify that "their claim is narrowly focused on BLM's failure to implement the specific appropriate actions" detailed in the agency's 2006 Determinations for the grazing allotments in Grand Staircase and Glen Canyon.  Pls.' Opp'n at 9.  Thus, the Court must evaluate the connection between the District of Columbia and the operative facts underlying those BLM actions (and inactions) in order to determine whether plaintiffs' choice of venue should be accorded deference.  Because the Court's analysis of plaintiffs' choice of venue (the first private interest factor) touches on both defendants' choice of forum (the second private interest factor)

6

and where the claim arose (the third private interest factor), these three factors will be analyzed together.

Defendants contend that transfer is appropriate because there are no meaningful ties between this controversy and the District of Columbia. Defs.' Mot. at 9; Reply in Supp. of Federal Defs.' Mot. to Transfer at 8 [ECF 18] ("Defs.' Reply"). They argue that plaintiffs "manufactured" venue in the District of Columbia by suing the Acting Director of BLM and the Secretary of the Interior, rather than the lower level agency officials in Utah who are responsible for the 2006 Determinations. Defs.' Mot. at 6. Plaintiffs respond that "[a]s is standard practice in administrative law cases, and as expressly authorized by the APA, plaintiffs have brought their claim against the agency officials ultimately in charge of carrying out the statutory and regulatory obligations at issue, i.e., the Acting Director of BLM and the Secretary of DOI." Pls.' Opp'n at 11; see 5 U.S.C. § 703 (providing that APA claims "may be brought against the United States, the agency by its official title, or the appropriate officer" responsible for administering the statute).

However, "the mere fact that a case concerns the application of a federal statute by a federal agency does not provide a sufficient nexus to the District of Columbia to weigh against transfer."[2] Pres. Soc. of Charleston, 893 F. Supp. 2d at 55; see also Shawnee Tribe v. United States, 298 F. Supp. 2d 21, 25-26 (D.D.C. 2002) ("[M]ere involvement on the part of federal agencies, or some federal officials who are located in Washington D.C. is not determinative.").

---

[2] Courts in this district must examine challenges to venue carefully "to guard against the danger that a plaintiff might manufacture venue in the District of Columbia." Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993). Otherwise, "[b]y naming high government officials as defendants, a plaintiff could bring a suit here that properly should be pursued elsewhere." Id.; see also Stockbridge-Munsee Cmty. v. United States, 593 F. Supp. 2d 44, 47 (D.D.C. 2009). Venue is not appropriate in the District of Columbia where "the only real connection [the] lawsuit has to the District of Columbia is that a federal agency headquartered here . . . is charged with generally regulating and overseeing the [administrative] process." DeLoach v. Philip Morris Co., Inc., 132 F. Supp. 2d 22, 25 (D.D.C.2000).

Even assuming arguendo that the BLM office here helped set the parameters of the appropriate actions to be pursued on the Utah grazing lands, "this fact would not necessarily create a nexus between the controversy and the District of Columbia." SUWA III, 845 F. Supp. 2d at 235 (internal quotation marks omitted). "A plaintiff seeking to sue federal defendants in Washington, D.C. must [] demonstrate some 'substantial personalized involvement by a member of the Washington, D.C.' agency before the court can conclude that there are meaningful ties to the District of Columbia." Id. (quoting S. Utah Wilderness Alliance v. Norton, 2002 WL 32617198, at *3 (D.D.C. June 28, 2002) ("SUWA I")). Compare Tohono O'Odham Nation v. Salazar, No. 10-0472, slip op. at 5-6 (D.D.C. Apr. 21, 2010) ("[T]he substantial personal involvement of senior federal officials in Washington, D.C. . . . demonstrates a nexus between this suit and [plaintiff's] chosen forum."), and Wilderness Soc'y v. Babbitt, 104 F. Supp. 2d 10, 14 (nexus with the District of Columbia was present where public meetings about the challenged issue were held in Washington, D.C., and where the Secretary of the Interior visited the area at issue, met with interested parties, signed the record of the decision, and gave a public briefing about his decision), with Flowers, 276 F. Supp. 2d 62 at 67-68 (granting transfer where no Washington, D.C. officials played an active role in the agency decision at issue), and Trout Unlimited v. U.S. Dep't of Agric., 944 F. Supp. 13, 17-18 (D.D.C. 1996) (transferring case from the District of Columbia to Colorado where the relevant administrative decisions were made and noting that deference to plaintiff's choice of forum was mitigated due to limited involvement by Washington, D.C. based officials). Transfer is appropriate "when the material events that constitute the factual predicate for the plaintiff's claims occurred in the transferee district." SUWA III, 845 F. Supp. 2d at 235 (internal quotation marks omitted).

Here, the primary issue is BLM's implementation of its 2006 Determinations. This case thus turns on BLM's actions and inactions in Utah connected to those Determinations. Based on

8

the conduct at issue, plaintiffs' claims are centered in the District of Utah because the decisions and activities related to BLM's 2006 Determinations appear to have occurred there. See Defs.' Mot. at 9. Furthermore, the grazing lands at issue are located in Utah, the effects of BLM's actions will be felt primarily in Utah, and the relevant decisionmakers reside in Utah, thus giving the District of Utah meaningful ties to this controversy.

Plaintiffs allege no specific involvement or meaningful role by any BLM, NPS, or DOI personnel in Washington in either crafting or implementing the 2006 Determinations. Although staff from agency headquarters may have been involved in a general advisory capacity, they did not direct the process leading to the 2006 Determinations or actions in response to those Determinations. The relationship between the challenged agency inaction—BLM's delay in implementing the 2006 Determinations—and this District is attenuated at best. In contrast, Utah has a substantial connection to the controversy. Local officials in BLM Utah field offices were tasked with establishing standards for and gathering data on the management of the grazing lands at issue. The 2006 Determinations appear to have been created, drafted, and developed in BLM's Utah field offices, which are also charged with implementing the appropriate actions specified therein. See Defs.' Mot. at 9; Defs.' Reply at 5. Given these facts, there is little connection between the claims pled, which relate solely to BLM's administration of grazing allotments in Utah, and plaintiffs' decision to file this lawsuit in the District of Columbia. Consequently, plaintiffs' choice of forum is not entitled to deference and this factor weighs in favor of transfer.

Because the decisionmaking process in this case appears to have taken place in Utah, the private interest factor regarding where the claim arose also supports transfer to the District of Utah. "In cases brought under the APA, courts generally focus on where the decisionmaking process occurred to determine where the claims arose." Nat'l Ass'n of Home Builders, 675 F.

Supp. 2d at 179.  Although high level BLM, NPS, and DOI officials ultimately oversee all agency activities, this is insufficient to favor venue in the District of Columbia.  See, e.g., Valley Cmty. Pres. Comm'n v. Mineta, 231 F. Supp. 2d 23, 47 (D.D.C. 2002) (no nexus to Washington where "there has not been, to date, decision-making involvement by high-ranking federal officials who are located in the District of Columbia"); Shawnee Tribe, 298 F. Supp. 2d. at 25-26 ("While some officials from . . . the Department of Interior who work in the Washington, D.C. area are involved in the [dispute], the decisionmaking process, by and large, has not been substantially focused in this forum.").  Plaintiffs' claim centers on Utah decisionmaking. Because individuals who work in BLM's Utah offices "made the lion's share of decisions regarding the details and contours" of the Determinations at issue, this factor weighs in favor of transfer.  SUWA III, 845 F. Supp. 2d at 236; see also Southern Utah Wilderness Alliance v. Norton, 315 F. Supp. 2d 82, 87 (D.D.C. 2004) ("SUWA II") (approving transfer where decisions were made by Bureau of Land Management officials in Utah).

      b.      **The Convenience of Parties**

Defendants argue that the convenience of parties factor supports transfer because plaintiffs' "only apparent connection to the District of Columbia is the location of [their] counsel."  Defs.' Mot. at 9.  Plaintiffs respond that "[t]his case is between a non-profit organizational plaintiff, which often litigates in this forum and whose counsel (who specialize in environmental and APA litigation) are present here, and the federal government, which routinely defends this kind of litigation in this forum, and whose counsel are also present here."  Pls.' Opp'n at 17.  However, courts in this district have previously found that "[t]he fact that plaintiffs' counsel is in the District of Columbia is of little significance."  Kazenercom TOO v. Turan Petroleum, Inc., 590 F. Supp. 2d 153, 163 (D.D.C. 2008) (citing Reiffin v. Microsoft Corp., 104 F. Supp. 2d 48, 52 (D.D.C. 2000) ("The location of counsel carries little, if any,

weight in an analysis under § 1404(a).")).  Moreover, because plaintiffs are Idaho citizens, they "made clear [their] willingness 'to forego the convenience of a geographically nearby forum'" when they filed this suit in the District of Columbia.  Treppel v. Reason, 793 F. Supp. 2d 429, 437 (D.D.C. 2011).

Although plaintiffs suggest that transfer would not increase convenience for defendants or defendants' attorneys, Pls.' Opp'n at 17, the location of defendants and their counsel is not a strong consideration when defendants move for transfer.  See Nw. Forest Res. Council v. Babbit, 1994 WL 908586, *3 n.6 (D.D.C.1994) ("Although defendant's counsel are located in the District of Columbia, any inconvenience to them is offset by the fact that they represent the party requesting the transfer.").  Ultimately, it is not clear that transfer to the District of Utah would be more convenient for either party than litigating this case in the District of Columbia, and thus this factor is neutral.

### c.  The Convenience of Witnesses and Ease of Access to Sources of Proof

Plaintiffs argue that access to witnesses and sources of proof beyond the administrative record are irrelevant here because "this is an APA case in which the court will likely be 'limited to a review of the administrative record' bearing on whether defendants are obligated to carry out the specific appropriate actions embodied in BLM's formal Determinations, and whether they have done so."  Pls.' Opp'n at 13-14 (quoting Akiachak Native Cmty. v. DOI, 502 F. Supp. 2d 64, 68 (D.D.C. 2007)).  Defendants reject plaintiffs' assertion that this APA case will be limited to the administrative record and contend that future proceedings "may include the testimony of local BLM officials and other witnesses."  Defs.' Reply at 6.

Because this case is about agency inaction in response to the 2006 Determinations, rather than agency action, this case may not be resolved solely based on the administrative record. Plaintiffs are correct that in a challenge to final agency action judicial review is ordinarily

11

limited to the administrative record at the time of the agency's decision, Aguayo v. Harvey, 476 F.3d 971, 976 (D.C. Cir. 2007), but that is not the case in a challenge to an agency's failure to act. When it comes to agency inaction under 5 U.S.C. § 706(1), "review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." Friends of the Clearwater v. Dombeck, 222 F.3d 552, 560 (9th Cir. 2000). "Said another way, if an agency fails to act, there is no 'administrative record' for a federal court to review." Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) (quoting Telecomms. Research & Action Ctr. v. FCC, 750 F.2d 70, 79 (D.C. Cir. 1984)). Therefore, "there may well be reason for discovery, since agency delay is not necessarily a discrete event resulting from a decision based upon some sort of administrative record, but may be simply . . . after-the-event justifications [ ] which may need to be explored by plaintiffs." Id.; see also Cobell v. Babbitt, 91 F. Supp. 2d 1, 38 (D.D.C. 1999) ("Extrinsic evidence is appropriate for consideration when the processes utilized and factors considered by the decisionmaker require further explanation for effective review." (internal quotation marks omitted)).

The Court, therefore, does not disregard the convenience of witnesses and ease of access to sources of proof because it may need to look to material beyond the administrative record. Defendants correctly note that "any motion for summary judgment may rely on affidavits or declarations as well as on the documentation in BLM's files related to the alleged inaction," which are not necessarily part of the administrative record. Defs.' Reply at 6 n.5; see 5 U.S.C. § 706(1); Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 61-65 (2004); Nat'l Ctr. on Homelessness and Poverty, 842 F. Supp. 2d at 130. Relevant witnesses and records would most likely be located in Utah, where the local BLM action or inaction occurred. Moreover, "no relevant records or witnesses are available exclusively in [the District of Columbia]" so as to

make it the preferred venue. SUWA II, 315 F. Supp. 2d at 88. As a result, this factor weighs in favor of transfer.

## II.     Public Interest Considerations

### a. The Transferee's Familiarity with Governing Laws

Judges in both districts are presumed to be equally familiar with the federal laws governing this dispute, and thus this factor is not germane since no state law claims are at issue. See Greater Yellowstone Coal. v. Bosworth, 180 F. Supp. 2d 124, 129 (D.D.C. 2001) (denying transfer because the case involved only federal statutes and did not require the court to interpret state laws); see also In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1175 (D.C. Cir. 1987).

### b. The Relative Congestion of the Transferor and Transferee Court Calendars

Defendants are correct that the "court congestion factor is significant and germane here," Defs.' Mot. at 7-8, but that factor weighs in favor of keeping the case in plaintiffs' chosen forum. Defendants cite the higher total number of pending cases in the District of Columbia versus the District of Utah, and conclude that "[c]leary, the U.S. District Court for the District of Utah is a much less congested court than this Court" without reference to a critical factor bearing on the severity of court congestion: the total number of judges on each court. See Defs.' Mot. at 7. As plaintiffs correctly argue, the apt comparison is between the average number of cases pending per judgeship on each court. See Pls.' Opp'n at 12; Nat'l Ass'n of Home Builders, 675 F. Supp. 2d at 178 (explaining that because the proposed transferee district had "even more pending cases per judgeship than this district," the congestion factor "does not support transfer"). Because the District of Utah has over one hundred and fifty more pending cases per judgeship than the

13

District of Columbia,[3] its docket is more congested than this Court's and thus this factor weighs against transfer.

### c. The Local Interest in Deciding Local Controversies at Home

"[I]n cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home." Adams v. Bell, 711 F.2d 161, 167 (D.C. Cir. 1983). Courts prefer to resolve cases in the forum where people "whose rights and interests are in fact most vitally affected by the suit." Id. at 167 n.34. Thus, the interests of justice are promoted when a localized controversy is resolved in the region it impacts. Oil, Chem. & Atomic Workers Local Union No. 6-418 v. Nat'l Labor Review Bd., 694 F.2d 1289, 1300 (D.C. Cir. 1982). "This rationale applies to controversies involving federal decisions that impact the local environment, and to controversies requiring judicial review of an administrative decision." Flowers, 276 F. Supp. 2d at 70.

Defendants assert that "Utah's residents and citizens will be directly affected" by this lawsuit and therefore it should be adjudicated in a location that is convenient to the interested public. See Defs.' Reply at 7-8. Plaintiffs respond that "as in the vast majority of APA cases, there will be no 'trial' for the public to attend wherever this case is decided," and thus this factor does not support transfer. Pls.' Opp'n at 15. However, plaintiffs' focus on whether there will be a trial is misplaced. Whether there will be a trial in view of the interested public is only a small manifestation of the larger issue: whether the ultimate decision will impact local citizens. That is, a court's analysis of the local interest factor depends on whether the decision will directly

---

[3] At the end of 2011 (the most recent period for which statistics are available), the District of Utah had 417 pending cases per judgeship while the District of Columbia had 247. See Pls.' Opp'n, Ex. B. Although the complexity of the cases may not be the same, the difference in raw numbers is substantial.

affect citizens of the transferee district, not whether interested citizens can take part in any trial. See New Hope Power Co. v. U.S. Army Corps of Eng'rs, 724 F. Supp. 2d 90, 97 (D.D.C. 2010); see also SUWA II, 315 F. Supp. 2d at 88 ("Land is a localized interest because its management directly touches local citizens."). Because this case concerns grazing management on federal lands, Utah residents who use those lands for cattle grazing will be directly affected by the outcome of the case. That is, the District of Utah possesses a "significant and predominant" interest in this suit given the impact its resolution will have upon the affected lands, wildlife, and people of that district. See Trout Unlimited, 944 F. Supp. at 17-18, 20 (deeming transfer appropriate where the "controversy [arose] from an administrative decision made in Colorado which directly affects Colorado's Arapaho and Roosevelt National Forests, water systems, wildlife, and more importantly, its people").

Plaintiffs also assert that the local interest factor does not support transfer because "this case concerns an issue of indisputably national import," relying on Otay Mesa Prop., 584 F. Supp. 2d 122. See Pls.' Opp'n at 15-16. But that reliance is also misplaced. Defendants do not contend that only Utah residents have an interest in the resolution of this case (as plaintiffs characterize defendants' argument, see Pls.' Opp'n at 15); rather, defendants correctly observe that because Utah residents have a broad interest in the issues, and because it will impact them directly, the controversy is local in nature.[4] See Defs.' Mot. at 8; Otay Mesa Prop., 584 F. Supp. 2d at 126-28 (challenging an Endangered Species Act critical habitat designation that affected

---

[4] As another court in this district previously clarified, the Otay court "determined that the controversy was not of generalized local interest because it was, in a sense, too localized: as it only touched on these particular parcels of land, there was no broad local interest in the controversy and [thus] it could be properly heard in the District of Columbia." Pres. Soc. of Charleston, 893 F. Supp. 2d at 58 (citing Otay Mesa Prop., 584 F. Supp. 2d at 127 ("[T]he outcome of this case will have no direct or unique impact upon the residents of San Diego County. It is on this point that the Federal Defendants' argument for transfer ultimately fails.")).

only plaintiff's individual parcels of land). The impacts of this case will be direct and unique on Utah residents and over the greater Grand Staircase and Glen Canyon area.

The implications of a decision resolving this dispute will be felt most acutely in Utah where local citizens are directly affected and therefore the local interest in this case outweighs the national interest. See, e.g., Nat'l Wildlife Fed'n v. Harvey, 437 F. Supp. 2d 42, 49-50 (D.D.C. 2006) (holding that the Everglades' location in Florida and its impact on local ecosystems and people outweighed the national interest in the natural beauty of the area); SUWA III, 845 F. Supp. 2d at 238 ("While there can be no debate about the objective natural beauty of these locations, this fact alone does not suffice to create a national interest that outweighs Utah's strong local interest in having local controversies decided within its borders."); SUWA II, 315 F. Supp. 2d at 88-89 (finding that local Utah interest outweighed any national interest in "protecting the many special places in Utah's canyon country" and that where the "alleged consequences would be most particularly felt in Utah . . . the courts of Utah would have a clear interest in resolving the dispute").

Of note, over the past decade three similar cases have been transferred by courts in this District to the District of Utah. See SUWA III, 845 F. Supp. 2d 231; SUWA II, 315 F. Supp. 2d 82; SUWA I, 2002 WL 32617198. In each case, "[t]he court found that Utah's interest in the case was substantial and outweighed any interest in litigating the case in the District of Columbia," rejecting many of the arguments raised by plaintiffs here. This Court agrees with the analysis in those cases and concludes that transfer is appropriate because "the dispute in this instance will have the greatest impact on the citizens of Utah." SUWA II, 315 F. Supp. 2d at 89 (quoting SUWA I, 2002 WL 32617198, at *9).

## CONCLUSION

In sum, the Court concludes that considerations of convenience and the interest of justice weigh in favor of transfer to the District of Utah. Plaintiffs have failed to demonstrate that this District has meaningful ties to the controversy, which has significant local interest in the Utah. The Court therefore grants defendants' motion to transfer venue to the District of Utah. An order consistent with this Memorandum Opinion will be issued separately.

<div style="text-align: right">

/s/
JOHN D. BATES
United States District Judge

</div>

Dated: <u>April 30, 2013</u>